**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**

**CIVIL ACTION NO. 23-99-DLB-EBA**

**JULIE EVANS** **PLAINTIFF**

**v.** **<u>MEMORANDUM ORDER</u>**

**WOODLAND OAKS OPERATIONS LLC** **DEFENDANT**

* * * * * * * * * * * * * * * *

## I. INTRODUCTION

This matter comes before the Court on three motions: Defendant Woodland Oaks Operations, LLC's ("Woodland") Motion for Summary Judgment (Doc. # 37), Woodland's Motion to Strike (Doc. # 40), and Plaintiff Julie Evans's Motion to Supplement the Record (Doc. # 43). These motions are fully briefed and ripe for the Court's consideration. For the following reasons, Woodland's Motion to Strike (Doc. # 40) is **denied**, Evans's Motion to Supplement (Doc. # 43) is **granted**, and Woodland's Motion for Summary Judgment (Doc. # 37) is **granted.**

## II. FACTUAL AND PROCEDURAL BACKGROUND

This case concerns the circumstances and events that gave rise to the end of Plaintiff Julie Evans's employment at Woodland. Woodland is a long-term care and rehabilitation facility located in Ashland, Kentucky. (Doc. # 37-1 ¶ 3). It offers a variety of services to its residents, including short-term rehabilitation, long-term care, respite care, post-hospital care, hospice care, IV therapy, comprehensive wound care, pain management, stroke and neurological care, and restorative nursing care. (*Id.*).

Woodland hired Evans as a Licensed Practical Nurse on June 5, 2005. (*Id.* ¶ 7; Doc. # 37-2 at 43:18-23). This role required Evans to provide Woodland residents with treatments and medications, monitor their blood sugar levels, and care for their overall wellbeing. (Doc. # 37-2 at 45:2-46:10). As a Woodland employee, Evans was subject to various policies, and she was required to adhere to a certain standard of conduct. (*Id.* at 66). These standards and policies are memorialized in Woodland's Employee Handbook. (*Id.* at 61-85). Evans received a copy of the Handbook upon her hiring in 2005, and she signed an acknowledgement each time Woodland updated its contents. (*Id.* at 64:10-20). An up-to-date copy of the Handbook was available to Evans and her co-workers through Woodland's human resources department. (*Id.*).

The Handbook sets forth a non-exhaustive list of inappropriate conduct that provides grounds for discipline including termination of employment. (*Id.* at 66). Examples include modifying a work schedule without prior supervisory approval, failure to satisfactorily perform the "Functions of the Job" outlined in an employee's job description, and insubordination. (*Id.*). Additionally, the Handbook describes Woodland's "open-door policy." (*Id.* at 72). Under this policy, Woodland employees are encouraged to raise suggestions, complaints, and questions concerning their employment. (*Id.*). The purpose behind Woodland's open-door policy "is to promptly review any topic, issue, or complaint" brought by an employee. (*Id.*). Importantly, the policy expressly forbids "[r]etaliation by any member of management [against] an employee who has voiced a work-related concern[.]" (*Id.*).

Evans acknowledges that her employment at Woodland was at-will in nature. (*Id.* at 53). As a Woodland employee, she could be discharged "at any time, with or without

cause." (*Id.*). An important part of Evans's role involved adherence to the chain of command at Woodland. (*Id.* at 48:3-25). Evans reported directly to Woodland's Director of Nursing, Tish Palladino. (*Id.* at 48:3-8). Palladino managed and supervised Woodland's LPNs, including Evans. (Doc. # 37-1 ¶ 8). Palladino, in turn, reported directly to Tony Mollica, Woodland's Administrator. (*Id.* ¶ 8). Mollica managed operations at Woodland, provided oversight, and was responsible for the hiring and firing of Woodland employees, including Woodland's nursing staff. (*Id.*).

To assign responsibilities to its patient care staff, Woodland utilized nursing floor plans, which were drafted daily by Woodland's scheduler, Emily Steele. (Doc. # 37-2 at 52:25-53:5). In drafting floor plans, Woodland sought to ensure an equitable and safe distribution of the workload among the scheduled LPNs, nursing aids, and other staff tasked with patient care. (*Id.* at 52:3-24). Palladino retained authority over modifications to the floor plan. (*Id.* at 56:15-57:2; Doc. # 37-1 ¶ 13). However, because Palladino did not arrive at Woodland until 8:00 a.m. each day—roughly two hours after the patient care staff began their shift—she was unable to approve modifications occurring before 8:00 a.m. (*Id.* at 57:19-58:7). Thus, the nursing staff were permitted to collaborate on modifications to the floor plan amongst themselves prior to Palladino's arrival. (*Id.* at 57:19-58:11). This was a longstanding practice. (*Id.*). However, no member of Woodland staff had permission to alter a floor plan in a manner that put patient safety at risk. (*Id.* at 59:6-20).

The events that culminated in Evans's termination began in the middle of 2022. Several months prior to Evans's termination, she accused Palladino of improperly deleting information from patient charts, among other things. (Doc. # 95:5-15; 96:7-9). Although

Evans was initially unable to escalate her complaint regarding Palladino, she testified at her deposition that she eventually reported her concerns regarding patient information to Tara Helton, a Regional Nurse Consultant employed by Woodland's corporate management affiliate. (*Id.* at 99:18-24). However, Helton denies receiving such a complaint. (Doc. # 37-3 ¶ 4). At some point in August of 2022, Evans attended a meeting with Mollica, Palladino, and Sharon Setliffe—a nurse at Woodland—at which she reiterated her accusation that Palladino was deleting patient information. (Doc. # 37-2 at 86:14-87:4). Evans made several additional complaints about Palladino during this meeting. (*Id.*).

On August 15, 2022, Evans made unilateral modifications to the floor plan. (*Id.* at 66:19-67:14). In a memo created on August 18, 2022, Palladino states that she explicitly directed Evans to refrain from making changes to the floor plan without prior approval. (*Id.* at 86). However, Evans denies that Palladino gave such direction on August 15. (*Id.* at 67:18-19). At any rate, on August 26, 2022 Evans modified the floor plan without prior approval. (*Id.* at 79:19-80:15; Doc. # 37-1 ¶ 11; Doc. # 37-4 ¶ 3). After reviewing Evans's modifications, Palladino prepared a revised floor plan. (*Id.* at 74:18-25). Evans refused to accept Palladino's revisions, asserting that the new floor plan was unsafe. (*Id.* at 75:17-20, 88). When Palladino spoke with Evans about the new floor plan, Evans stated that Mollica had told her that she did not have to comply with a floor plan assignment that placed more than thirty residents under her care. (*Id.* at 77:14-18, 88).

In an effort to resolve this impasse, Palladino and Lisa Adkins met with Mollica. (Doc. # 37-1 ¶ 11). Adkins and Palladino informed Mollica that Evans objected to Palladino's revised floor plan assignment and refused to abide by it. (*Id.*). Mollica then

called for a meeting with Evans. (*Id.*; Doc. # 37-2 at 72:15-19). Evans, Palladino, Adkins, and Mollica gathered in Mollica's office. (Doc. # 37-2 at 88). At this meeting, Mollica urged Evans to follow the chain of command and adhere to Palladino's orders. (*Id.* at 78:17-20; Doc. # 37-1 ¶ 12). However, Evans responded that she considered Palladino's revised floor plan unsafe. (*Id.*; Doc. # 37-1 ¶ 12). Mollica asked about Evans's basis for this belief. (*Id.* at 78:24-79:4; Doc. # 37 ¶ 12). Evans replied that she felt Palladino's plan assigned her too many residents to manage without proper support. (*Id.*). Mollica took Evans's input on board but concluded that Palladino's revised floor plan was reasonable. (*Id.* at 84:25-85:12). As a result, Mollica instructed Evans to comply with Palladino's floor plan. (*Id.*; Doc. # 37-2 ¶ 13). Nonetheless, Evans defied Mollica's instructions and "refused" to follow Palladino's floor plan. (*Id.*). Mollica then directed Evans to leave Woodland for the day. (*Id.* at 85:13-14). When Evans asked if she was being fired, Mollica replied "not at this moment." (*Id.* at 85:18-21). After Evans left the premises, Palladino and Adkins informed Mollica that Evans had previously refused to comply with one of Palladino's modified floor plans on August 15, 2022.[1] (Doc. # 37-1 ¶ 14). Palladino also informed Mollica that, on August 15, 2022 she directed Evans to refrain from modifying floor plans in the future. (*Id.* ¶¶ 11, 14; Doc. # 37-1 at 89).

In the wake of this meeting, Mollica set about on an investigation into Evans's previous behavior. (*Id.* ¶ 14; Doc. # 37-4 ¶ 6). He interviewed the other LPNs on duty on August 26, 2022, including Sarah Horn and Amber Ward. (*Id.* ¶¶ 14-15). Horn and Ward informed Mollica that they did not feel Palladino's revised floor plans were unsafe. (*Id.* ¶ 15). On the contrary, Horn stated that "the only time [she] felt the floor plan was unsafe

---

[1] As stated above, Evans denies that she refused to comply with Palladino's revised floor plan on August 15, 2022. (Doc. # 37-2 at 67:18-19).

was the very morning when [Evans] had made changes to it." (Doc. # 37-4 ¶ 6). In light of the information he gathered from the meeting with Evans and his discussions with Horn, Ward, and Palladino, Mollica concluded that Evans had been insubordinate. (Doc. # 37-1 ¶ 16). Therefore, on August 26, 2022, Mollica decided to fire Evans. (*Id.* ¶¶ 16-17; Doc. # 37-2 at 111:17-21). However, Evans was not informed of this decision until the following Monday, August 29, 2022, when Palladino called her. (Doc. # 37-2 at 111:13-21).

After Evans left Woodland on August 26, 2022, as Mollica was conducting his investigation, she made a series of complaints to Woodland's compliance hotline. (*Id.* at 107:24-109:14). Evans's first call to the hotline occurred before Evans had even left the parking lot at Woodland. (*Id.* at 109:9-14). In this call, Evans voiced the same concerns that she raised during her meeting with Palladino, Adkins, and Mollica. (*Id.* at 90). Around 4:18 p.m. on August 26, 2022, Evans placed a second call to the hotline. (*Id.*). Evans did not inform Palladino or Mollica that she planned to make these calls or that she, in fact, made them. (*Id.* at 109:11-18). Mollica was unaware that Evans made these calls at the time he decided to terminate her employment.[2] (Doc. # 37-1 ¶ 18).

On September 18, 2023, Evans filed the instant Complaint in Boyd Circuit Court, bringing a single claim for wrongful discharge against Woodland Oaks, LLC, Latisha Palladino, and Tony Mollica. (Doc. # 1-1 at 3-7). Defendants removed the case to this Court on October 11, 2023. (Doc. # 1). On December 8, 2023, this Court dismissed Palladino and Mollica as defendants because, in Kentucky, there is no common law action

[2] In her Response, Evans claims that she also "reported her concerns to the Office of Inspector General[.]" (Doc. # 40 at 12). However, Evans does not identify the date she made this report or its contents.

for wrongful termination against individual supervisors. *See Temple v. Pflugner*, 866 F. Supp. 2d 735, 744 (E.D. Ky. 2011).

Woodland, the lone remaining defendant, moved for summary judgment on September 19, 2025. (Doc. # 37). Evans filed a Response in opposition. (Doc. # 40). Along with her Response, Evans submitted her own affidavit as well as unsworn statements from Terri Akers, Amber Ward, Sharon Setliff, and Jessica Wells. (Doc. # 40-1). Woodland subsequently moved to strike the four unsworn statements. (Doc. # 41). Rather than dispute the merits of Woodland's Motion to Strike, Evans responded by filing a Motion to Supplement the Record (Doc. # 43) with affidavits adopting the unsworn statements. (Doc. # 43-1). Woodland filed a combined Reply in support of its Motion to Strike and Opposition to Evans's Motion to Supplement. (Doc. # 44). Accordingly, this matter is ripe for the Court's review.

## III. WOODLAND'S MOTION TO STRIKE AND EVANS'S MOTION TO SUPPLEMENT

Before turning to the merits of Woodland's Motion for Summary Judgment, the Court must address the parties' respective evidentiary motions (Docs. # 41 and 43).

### A. Woodland's Motion to Strike (Doc. # 41) and Evans's Motion to Supplement (Doc. # 43)

Woodland moves to strike four third-party statements Evans filed along with her Response to Woodland's Motion for Summary Judgment. (Doc. # 41). Specifically, Woodland asks the Court to strike the statements made by Terri Akers, Amber Ward, Sharon Setliff, and Jessica Wells. (*Id.* at 1).

To be considered on summary judgment, "evidence must be sworn or made under the penalty of perjury." *Lauderdale v. Wells Fargo Home Mortg.*, 552 F. App'x 566, 571 (6th Cir. 2014) (citing *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 n.1 (6th Cir.

2010)). Often, such evidence takes the form of a notarized, sworn affidavit. However, the Court may also consider unsworn declarations that are made under penalty of perjury, certified as true and correct, dated, and signed. 28 U.S.C. § 1746; *see also Pollock v. Pollock*, 154 F.3d 601, 611 n.20 (6th Cir. 1998) (noting that unsworn declaration cannot be considered as evidence for summary judgment unless "made under penalty of perjury, certified as true and correct, dated, and signed" (citing 28 U.S.C. § 1746)).

None of the four statements identified by Woodland's Motion to Strike constitute sworn declarations fit for the Court's consideration. And because none of the statements are made under the penalty of perjury, they do not fall into 28 U.S.C. § 1746's exception. (*See* Doc. # 40-1 at 8-20). As a result, these statements are inadmissible for purposes of summary judgment.[3] *See Pollock*, 154 F.3d at 611 n.20; *O'Neal v. Emery Fed. Credit Union*, No. 1:13-cv-22, 2014 WL 842948, at *3 (S.D. Ohio Mar. 4, 2014) ("A district court does not abuse its discretion by refusing to consider as evidence unsworn statements that do not comply with the requirements of 28 U.S.C. § 1746.").

Evans does not dispute this conclusion. (Doc. # 43). Instead, Evans seeks permission to supplement the record with four notarized affidavits—sworn by Akers,

---

[3] Although Woodland asks the Court to strike these declarations, a separate motion to strike is inappropriate at this juncture. Fed. R. Civ. P. 56, advisory committee note of 2010 ("The burden is on the proponent [of evidence] to show that the material is admissible as presented or to explain the admissible form that is anticipated. *There is no need to make a separate motion to strike*.") (emphasis added). And "[M]options to strike are generally disfavored. Rather than striking material, a court may simply ignore inadmissible evidence." *Trs. Of the Plumbers & Steamfitters Local 184 Supplemental Pension Plan v. Ivitts Plumbing Contractors, Inc.*, No. 5:12-cv-112-TBR, 2014 WL 3905589, at *3 (W.D. Ky. Aug. 11, 2014). So, the Court will not consider evidence offered by Evans where she fails to establish its admissibility.

Ward, Setliff, and Wells[4]—which adopt and incorporate the previously-submitted, unsworn statements. (DE 43-1 at 1-17).

Woodland opposes Evans's Motion to Supplement. (Doc. # 44). First, Woodland argues that these affidavits are procedurally untimely in light of the Court's scheduling order and subsequent amendments thereto (Docs. # 11, 32, and 39). (*Id.* at 2). Under this schedule, Evans's deadline to respond to Woodland's Motion for Summary Judgment fell on November 7, 2025. (Doc. # 39). However, Evans did not move to supplement the record until December 23, 2025. (Doc. # 43). Second, Woodland contends that allowing Evans to supplement the record with these affidavits would cause unfair prejudice. (*Id.* at 4). Woodland notes that it "expended time and resources identifying evidentiary defects and briefing summary judgment based on the record as filed." (*Id.* at 5). Finally, Woodland argues that, even if the affidavits are timely and non-prejudicial, the Court should refuse to consider them because they fail to establish that the declarants have personal knowledge of or are competent to testify to the facts set forth in the statements.[5] (Doc. # 44 at 6).

The Court declines Woodland's invitation to reject these affidavits under Federal Rule of Civil Procedure 16(b)(4) as untimely and prejudicial. A scheduling order can be modified only for "good cause." Fed. R. Civ. P. 16(b)(4). In determining whether good cause exists for modification, the "primary measure" concerns "the moving party's diligence in attempting to meet the case management order's requirements." *Inge v.*

[4] In what appears to be a clerical error, the affidavit signed by Jessica Wells begins by stating that the affiant is "Terry Akers." (DE 43-1 at 9).

[5] Evans subsequently filed a document styled as a "Sur-Reply to Defendant's Reply in Support of It's [sic] Motion to Strike." (Doc. # 46). However, the Court construes this as a reply in support of Evans's Motion to Supplement (Doc. # 43).

*Rock Fin. Grp.*, 281 F.3d 613, 625 (6th Cir. 2002) (quotation omitted). However, the Court must also consider whether the non-moving party will be prejudiced by the requested modification. *Marcilis v. Township of Redford*, 693 F.3d 589, 597 (6th Cir. 2012). Woodland claims that Evans has made no effort to "demonstrate diligence in filing proper affidavits with her response to Woodland's summary judgment motion or to identify any unavoidable circumstances that prevented timely compliance with the parties' scheduling order." (Doc. # 44 at 3). As support, Woodland cites an unpublished opinion from the Sixth Circuit affirming denial of a motion under Rule 16. (*Id.* (citing *Commerce Benefits Grp., Inc. v. McKesson Corp.*, 326 F. App'x 369, 377 (6th Cir. 2009)).

But *Commerce Benefits* is distinguishable. In that case, the court denied a party's motion to enlarge the time for discovery, finding that a further delay would have resulted in unnecessary additional expenditure of resources. *Commerce Benefits*, 326 F. App'x at 377-78. Here, Evans does not seek additional time to conduct discovery. Rather, she seeks permission to file affidavits that remedy the evidentiary defects of the unsworn statements submitted with her Response. Unlike the movant in *Commerce Benefits*, Evans does not seek time to gather new evidence and file additional briefing. The other cases Woodland cites are inapposite for similar reasons. *See, e.g., Moore v. United States*, No. 6:14-114-DLB-HAI, 2017 WL 1003248, at *1 n.1 (E.D. Ky. Mar. 15, 2017) (denying motion to supplement the record with an amended expert affidavit that would include additional facts and opinions on key issues); *In re Onglyza (Saxagliptin) and Kombiglyze XR (Saxagliptin and Metformin) Prods. Liab. Litig.*, No. 5:18-md-2809 -KKC, 2022 WL 3050665, at *4 (E.D. Ky. Aug. 2, 2022) (denying motion to modify the scheduling order to stay consideration of a pending motion for summary judgment and permit the

plaintiffs time to identify a new expert on general causation); *Puckett v. Kirk*, No. 3:23-cv-P460, 2025 WL 1336345, at *1 n.1 (W.D. Ky. May 7, 2025) (denying a plaintiff's attempt to supplement the record with new evidence for purposes of a Rule 59(e) motion to alter the court's order granting summary judgment to the defendants); *Powers v. AutoZoners, LLC*, No. 3:23-cv-609-RGJ, 2025 WL 2235414, at *7-8 (W.D. Ky. Aug. 5, 2025) (denying a motion to supplement the record with a newly-taken deposition for purposes of a motion to reconsider the court's order denying summary judgment). Permitting Evans to file the affidavits here would not cause any delay in the Court's resolution of Woodland's Motion for Summary Judgment. Nor would it unfairly surprise Woodland. Indeed, the affidavits are substantively identical to the unsworn statements submitted with Evans's Response. Further, Evans states that she previously provided Woodland with these statements pursuant to Federal Rule of Civil Procedure 26. (Doc. # 43 at 1).

To be certain, Evans could—and should—have submitted properly authenticated declarations along with her original Response. However, given the lack of prejudice to Woodland and the fact that consideration of the affidavits will not delay Woodland's Motion for Summary Judgment, the Court will not strike the affidavits (Doc. # 43-1), and will **grant** Evans's Motion to Supplement (Doc. # 43). However, as explained below, even after considering these affidavits, the Court will grant Woodland's Motion for Summary Judgment.

## IV. WOODLAND'S MOTION FOR SUMMARY JUDGMENT

Woodland seeks summary judgment on Evans's claim for common law wrongful discharge—the lone remaining claim in her Complaint. (Doc. # 37 at 11).

**A. Standard of Review**

A motion for summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, no genuine dispute exists where no reasonable jury could return a verdict for the nonmoving party. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998). The moving party bears the burden of showing the absence of a genuine issue of material fact. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).

Once the movant has satisfied its burden, the non–moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It must produce evidence showing that a genuine factual issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record as a whole, a rational fact finder could not find for the non–moving party, summary judgment should be granted. *Ercegovich*, 154 F.3d at 349.

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th

Cir. 2001). Lastly, the Court must draw all reasonable inferences in favor of the non–moving party. *Matsushita*, 475 U.S. at 587.

Additionally, federal courts apply the substantive law of the forum state in diversity actions. *See City of Wyanotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001) (citing *Hanover Ins. Co. v. Am. Eng'g Co.*, 33 F.3d 727, 730 (6th Cir. 1994)). Accordingly, Kentucky substantive law will apply to Plaintiff's claim for wrongful discharge.

**B. Analysis**

In Kentucky, employers have wide latitude in their discretionary employment decisions. If an individual is employed on an at-will basis, her employer may discharge her "'for good cause, for no cause, or for a cause that some might view as morally indefensible.'" *Clarke v. Amazon.com Serv. LLC*, 699 F. Supp. 3d 596, 601 (E.D. Ky. 2023) (quoting *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1984)). There is, however, a narrow public-policy exception to Kentucky's "'terminable-at-will' doctrine"—the tort of wrongful discharge. *Hill v. Ky. Lottery Corp.*, 327 S.W.3d 412, 420 (Ky. 2010) (quoting *Firestone*, 666 S.W.2d at 734).

"To establish a cause of action for wrongful discharge, an employee must show that the termination was contrary to public policy evinced by a constitutional or statutory provision, or that the discharge directly resulted from the employee's refusal to violate the law during the course of his employment." *Greissman v. Rawlings and Assoc., PLLC*, 571 S.W.3d 561, 566 (Ky. 2019). Put differently, there are only two "situations in which discharging an at-will employee would be so contrary to public policy as to actionable despite the absence of 'explicit legislative statements prohibiting the discharge.'" *Hill*, 327 S.W.3d at 422 (quoting *Gryzb v. Evans*, 700 S.W.2d 309, 402 (Ky. 1985)); *see also*

*Alexander v. Eagle Manufacturing Co., LLC*, 714 F. App'x 504, 507 (6th Cir. 2017) (explaining that if there are not "statutes expressly prohibiting [the plaintiff's] discharge" then the "wrongful-discharge claim must fit into one of the two public-policy exceptions" enumerated in *Grzyb*). These two situations are: "1) Where the alleged reason for discharge of the employee was the employee's failure or refusal to violate a law in the course of employment; or 2) When the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment." *Hill*, 327 S.W.3d at 422 (citing *Gryzb*, 700 S.W.2d at 402). Additionally, the public policy invoked must have an "employment-related nexus[.]" *Greissman*, 571 S.W.3d at 567. That's to say, the public policy must be "directed at providing statutory protection to the worker in his employment situation." *Id.* Whether termination violated public policy is a question of law reserved for the Court. *Shrout v. The TFE Group*, 161 S.W.3d 351, 354 (Ky. Ct. App. 2005).

When, as here, a wrongful discharge is based on retaliation for protected conduct, the analysis follows a burden-shifting approach inspired by the *McDonnel Douglas* framework. *Oehler v. Eclipse Senior Living, Inc.*, No. 2:21-cv-135-REW-CJS, 2024 WL 4267213, at *8 (E.D. Ky. Sept. 23, 2024) (citing *Benningfield v. Fields*, 584 S.W.3d 731, 738 (Ky. 2018)). This approach proceeds in three steps. First, the plaintiff must sufficiently prove a *prima facie* case of wrongful discharge by showing: (1) that she engaged in a protected activity, (2) that she was discharged, and (3) that the protected activity was "a substantial and motivating factor but for which the employee would not have been discharged." *Follett v. Gateway Regional Health Sys., Inc.*, 229 S.W.3d 925, 929 (Ky. App. 2007) (citing *First Prop. Mgmt. Corp. v. Zarebidaki*, 867 S.W.2d 185, 188

(Ky. 1993)). However, "as there is rarely a case where a plaintiff has a 'smoking gun' to prove improper motive, a plaintiff must frequently 'rely on circumstantial evidence and the inferences that can be drawn therefrom to make his or her case.'" *Id.* (quoting *Willoughby v. Gen Corp, Inc.*, 809 S.W.2d 858, 861 (Ky. App. 1990)). If a plaintiff carries her burden and establishes a *prima facie* case, "the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Benningfield*, 584 S.W.3d at 739 (citations omitted). If the employer offers such a justification, the burden shifts back to the employee, who must demonstrate that "the proffered reasons were merely a pretext for retaliation." *Oehler*, 2024 WL 4267213, at *8 (citing *id.* and *Kentucky Dep't of Corr. v. McCullough*, 123 S.W.3d 130, 134 (Ky. 2003)). If a genuine issue of fact remains regarding the basis for termination, summary judgment is inappropriate. *Id.* (citations omitted).

### *1. Evans Makes a* **Prima Facie** *Case*

Evans claims that Woodland fired her in retaliation for her decision to report safety concerns to Palladino, Mollica, the Office of the Kentucky Inspector General, and Woodland's own Facility Compliance Hotline. (Doc. # 40 at 3-4 ("It was these complaints and the reporting of these complaints which led to the Plaintiff's termination, not any act of insubordination.")). And Evans argues that this is protected conduct, as evidenced by KRS § 216B.165. (*Id.* at 7). That statute provides, in relevant part, that

> [a]ny agent or employee of a health care facility or service licensed under this chapter who knows or has reasonable cause to believe that the quality of care of a patient, patient safety, or the health care facility's or service's safety is in jeopardy shall make an oral or written report of the problem to the health care facility or service, and may make it to any appropriate private, public, state, or federal agency.

KRS § 216B.165(1). Woodland does not challenge this claim. (Doc. # 37 at 12-15). Nor does Woodland argue that Evans was not discharged. Instead, Woodland contends that Evans cannot make out a *prima facie* case because she cannot "show that her termination was causally connected to any alleged protected activity." (*Id.* at 13).

First, Woodland argues that Evans cannot establish a causal connection because Mollica—the ultimate decisionmaker—was "unaware of the majority of Plaintiff's complaints at the time he made the decision to terminate [her employment.]" (Doc. # 37 at 14). Woodland contends that Mollica "was only aware of" the complaints Evans raised directly to him in August of 2022. (*Id.*). But, Woodland continues, these complaints "had no effect on his decision to terminate Plaintiff's employment[.]" (*Id.*). Thus, by Woodland's own admission, Mollica was aware of at least some of Evans's protected activity on August 26, 2022—the same day he decided to terminate her employment. Accordingly, the Court finds that Mollica was aware of at least some of Evans's protected activity at the time he decided to fire her.

Second, Woodland argues that Evans cannot rely on temporal proximity alone to support an inference of causation. (Doc. # 37 at 14-15). But Kentucky courts—and federal courts applying Kentucky law—have held that close temporal proximity "can serve as a sound circumstantial basis for the causation aspects of a *prima facie* [wrongful] discharge claim." *Oehler*, 2024 WL 4267213, at *9 (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation."); *Kentucky Dep't of Corr.*,

123 S.W.3d at 135 ("[A] close temporal proximity alone may be sufficient to raise the inference [of retaliation].")).

Here, Mollica decided to fire Evans on August 26, 2022—the same day Evans voiced her complaints and reports regarding patient safety. (Doc. # 37-1 ¶ 16). This easily qualifies as temporally proximate. *See Asbury Univ. v. Powell*, 486 S.W.3d 246, 259 (Ky. 2016) (holding that a period of a "few weeks" between protected activity and adverse employment actions "is a sufficiently short period to establish temporal proximity in making an indirect showing of causation").

To make a *prima facie* case of wrongful discharge, Evans need only identify evidence sufficient to raise the inference that her complaints to Woodland's administrators were a but-for cause of her firing. *McCullough*, 123 S.W.3d at 135 (citation omitted). Because Evans has done so, the Court must proceed to the next phase of the analysis.

***2. Woodland Sets Forth a Legitimate Basis for Evans's Firing***

Because Evans has established a *prima facie* case, the burden shifts to Woodland to articulate a legitimate reason for its termination decision. *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 497 (Ky. 2005). "The defendant bears only the burden of production and this involves no credibility assessments." *Id.*

Woodland maintains that Evans was fired because she "engaged in acts of insubordination which resulted in serious risks to staff and patient safety." (Doc. # 37 at 15). Specifically, Woodland argues that Mollica's decision to fire Evans flowed from his honest belief that Evans disobeyed Palladino's instruction to seek prior approval before modifying the floor plan on August 26, 2022. (*Id.*). Then, when Mollica instructed Evans to abide by the original floor plan, Evans refused. (*Id.*; Doc. # 37-2 at 85:1-12). Based

on these acts of insubordination, Mollica elected to terminate Evans's employment. (Doc. # 37-1 ¶ 16). Because Woodland articulates a legitimate, nondiscriminatory reason for its decision to fire Evans, it satisfies its burden under the second phase of the *McDonnell Douglas* framework. *Charalambakis v. Asbury Univ.*, 488 S.W.3d 568, 578 (Ky. 2016).

### ***3. Pretext***

Evans must demonstrate that Woodland's stated reason for her firing—insubordination—was "merely a pretext, masking the [retaliatory] motive." *Williams*, 184 S.W.3d at 497. A genuine issue of material fact regarding pretext would preclude summary judgment in Woodland's favor. *Oehler*, 2024 WL 4267213, at *8 (citing *Benningfield*, 584 S.W.3d at 739; *McCullough*, 123 S.W.3d at 134).

A plaintiff can show pretext in three ways. *Charalambakis*, 488 S.W.3d at 578 (quoting *Williams*, 184 S.W.3d at 497). First, she can demonstrate that the proffered reason for her termination "had no basis in fact." *Thomas v. Kmart Corp.*, No. 4:04-cv-171-M, 2006 WL 2802266, at *7 (W.D. Ky. Sept. 28, 2006) (quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds, Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009)). Second, a plaintiff can establish pretext by showing that the justification for her termination did not actually motivate her discharge. *Id.* Finally, a plaintiff can carry her burden by showing that her employer's stated reason was insufficient to motivate discharge. *Id.* Importantly, the Court "must not second guess the business judgment of the employer, but simply evaluate 'whether the employer gave an honest explanation of its behavior.'" *McConnell v. Swifty Transp., Inc.*, 198 F. App'x 438, 443 (6th Cir. 2006) (quoting *Hedrick v. W. Res. Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004)).

Evans offers scant evidence or argument to refute Woodland's claim that it decided to terminate her employment because of her failure to follow her superiors' instructions. She fails to clearly identify which of the three methods she adopts to press her claim of pretext. (*See* Doc. # 40 at 13-14). Instead, she simply argues that the temporal proximity between her complaint to Mollica on August 26, 2022, her reports to Woodland's compliance hotline, and her report to the Kentucky Office of the Inspector General and the termination of her employment "raise[s] a causal inference" that suggests pretext. (*Id.* at 13 (citing *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1079 (6th Cir. 1999))). Moreover, Evans asserts that during the August 26, 2022 meeting with Mollica and Palladino, she "was mocked and humiliated[.]" (*Id.*). As a result, Evans concludes that she "can make a prima farcie [sic] case for pretext." (*Id.* at 14). Out of an abundance of caution, the Court will examine Evans's argument under each of the methods by which a plaintiff may establish pretext.

**i. Woodland's proffered reason had a basis in fact**

First, Woodland argues that Mollica—the final decisionmaker as to Evans's termination—held the honest belief that Evans had engaged in multiple acts of insubordination. (Doc. # 37 at 16). Kentucky courts have recognized that an employer cannot be held liable if it acted upon an "honest belief" regarding its proffered reason for firing an employee "and made a reasonably informed and considered decision." *Hughes v. Norton Healthcare, Inc.*, No. 2019-CA-0222-MR, 2020 WL 79295190, at *12 (Ky. App. Dec. 11, 2020) (quoting *Ladd v. Grand Trunk Western R.R., Inc.*, 552 F.3d 495, 503 (6th Cir. 2009)). An employer can establish an honest belief upon a showing that it "reasonably rel[ied] on particularized facts before it at the time the decision was made."

*Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 795 (6th Cir. 2006) (internal quotation omitted).

Here, Mollica and, by extension, Woodland, only decided to fire Evans after investigating Palladino's report that Evans had previously been insubordinate. (Doc. # 37-1 ¶¶ 14-15). Mollica spoke with Palladino and other nurses who were on shift on August 26, 2022, including Sarah Horn and Amber Ward. (*Id.*). Horn reported that Evans unilaterally changed the floor plan in a manner that Horn felt to be unsafe. (Doc. # 37-4 ¶¶ 3-6). And Palladino reported to Mollica that Evans had previously made unilateral changes on August 15, 2022. (Doc. # 37-1 ¶ 16, Doc. # 37-2 at 86). In response, Palladino instructed Evans not to change the floor plan without her approval going forward. (Doc. # 37-2 at 86). Although Evans disputes that she received this warning, the undisputed evidence indicates that Mollica, at the time he decided to terminate Evans's employment, believed she did. (Doc. # 37-2 at 67:15-19; Doc. # 37-1 ¶ 16). Moreover, Evans was openly insubordinate during the meeting on August 26, 2022. Evans does not dispute that she unilaterally changed the floor plan the morning of August 26. (Doc. # 37-2 at 79:25-80:15). And although Evans contends that her modified floor plan was safer, Sarah Horn, another nurse on duty that morning, felt that it was unsafe. (Doc. # 37-4 ¶¶ 4-6). At any rate, after Evans refused to comply with Palladino's revisions, she was called to a meeting with Mollica, Lisa Adkins, and Palladino. (Doc. # 37-2 at 72:15-19). During this meeting, Mollica reviewed Palladino's revised floor plan, listened to Evans's concerns, and determined that the floor plan was safe. (Doc. # 37-1 ¶¶ 11-13). As a result, Mollica instructed Evans to follow Palladino's floor plan. (Doc. # 37-2 at

84:25-85:12; Doc. # 37-1 ¶ 13). Evans refused to follow Mollica's directions, so Mollica sent her home. (Doc. # 37-1 ¶ 13).

Because the undisputed facts show that Woodland had a legitimate basis to conclude that Evans had been insubordinate, she cannot succeed under the first method of demonstrating pretext. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) ("When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistake, foolish, trivial, or baseless.") (internal quotation omitted).

**ii. Evans cannot show that her insubordination did not actually motivate her firing**

A plaintiff can also demonstrate pretext by presenting "evidence 'which tends to prove that an illegal motivation was *more* likely than that offered by [the] defendant.'" *Most v. BWXT Nuclear Operations Grp., Inc.*, 743 F. App'x 664, 669 (6th Cir. 2018) (quoting *Brennan v. Tractor Supply Co.*, 237 F. App'x 9, 20 (6th Cir. 2007)).

Here, Evans offers no such evidence. Instead, she points to a meeting she attended "a few days before" the August 26, 2022 meeting. (Doc. # 40 at 13). At this meeting, which was attended by Evans, Sharon Setliff, Palladino, and Mollica, Evans made several complaints about Palladino to Mollica. (Doc. # 37-2 at 86:8-87:4). Evans testified at her deposition that, in response to each of her complaints, Mollica would "mock" her. (*Id.* at 87:11-18). This led Evans to speculate that she was "on the top of their list to terminate." (*Id.* at 87:20-22).

But Evans cannot carry her burden on the back of such subjective beliefs. *See Gott v. Sun Prods.*, No. 1:14-cv-71, 2015 WL 4720212, at *9 (W.D. Ky. Aug. 7, 2015) (finding that the plaintiff could not establish pretext where his argument "is based entirely

on unsupported speculation") (citing *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 623 (6th Cir. 2003)). And undisputed evidence leads to the conclusion that Mollica's decision to terminate Evans's employment was based on his honest belief that she had repeatedly defied orders from her superiors—by unilaterally changing the floor plan on August 15, and by refusing to comply with the floor plan approved by Palladino and Mollica on August 26. (Doc. # 37-1 ¶¶ 14-16). Thus, Evans has failed to show that the complaints she made to Mollica, rather than her insubordination, constitute the more likely cause of her firing.

**iii. Evans has failed to show that her actions were insufficient to motivate her firing**

Finally, Evans cannot show that her conduct was insufficient to motivate her firing. This ordinarily requires a showing "that the employer did not treat similarly situated employees adversely." *Johnson v. Donahoe*, 642 F.App'x 559, 611 n.19 (6th Cir. 2016). To be "similarly situated" for purposes of the pretext analysis, the other employees must have "been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Gott*, 2015 WL 4720212, at *8 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1991)).

Here, Evans does not identify specific comparators who engaged in similar conduct without suffering similar consequences. Certainly, she claims that "[t]here has been a history of 17 years of [Woodland nurses] changing floor plans and not until August of 2022 had anyone voiced any complaints about the changing." (Doc. # 40 at 15). However, even crediting Evans's claim that Woodland nurses had "full authority to alter

the floor plans," she fails to carry her burden.[6] (Doc. # 40-1 ¶ 4). Even if other nurses had the authority to modify floor plans in certain circumstances, Evans herself acknowledges that no Woodland employee could edit a work schedule in violation of a supervisor's order. (Doc. # 37-2 at 66:11-14). And Evans has not identified another Woodland nurse who refused to comply with a floor plan that was created by Palladino and affirmed by Mollica. Nor has Evans directed the Court to another Woodland nurse who unilaterally modified a floor plan in violation of an explicit instruction from Palladino.[7] As a result, she cannot carry her burden of showing that her insubordination did not provide a sufficient basis for Woodland's decision to fire her.

Evans has failed to carry her burden of showing that a reasonable jury could find that Woodland's decision to fire Evans because of her insubordination "had no basis in fact, did not actually motivate [Woodland's] challenged conduct, or was insufficient to motivate [Woodland's] challenged conduct." *Sams v. Anthem Companies, Inc.*, No. 2021 WL 3038893, at *11 (W.D. Ky. July 19, 2021) (quoting *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012)). Thus, even construing the evidence in the light most

---

[6] Evans's Affidavit, which she attached to her Response, appears to conflict with her deposition testimony on this point. During her deposition, Evans acknowledged that Woodland's employee handbook forbade unilateral changes to the work schedule. (Doc. # 37-2 at 65:21-66:8). Additionally, Evans previously stated that Woodland employees lacked authority to change the floor plan if such changes would create unsafe conditions. (*Id.* at 59:6-20). And Evans affirmed that Woodland nurses, herself included, lacked the authority to change a floor plan in violation of a supervisor's directives. (*Id.*). Under the Sixth Circuit's "sham affidavit" rule, Evans is prohibited from "crea[ting] a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). Accordingly, Evans cannot use her Affidavit to create factual issues on these points. However, even if the Court considered the allegations in her affidavit, Evans cannot identify a sufficiently analogous comparator.

[7] Again, the Court acknowledges that Evans maintains she did not receive such instruction. But, as discussed above, undisputed evidence shows that Mollica believed that Evans had received and violated such an order at the time he decided to fire her.

favorable to Evans, she cannot show that Woodland's justification is pretextual. As a result, the Court will **grant** Defendant's Motion for Summary Judgment on Evans's wrongful discharge claim.

## V. CONCLUSION

Accordingly, **IT IS ORDERED** that:

(1) Defendant's Motion for Summary Judgment (Doc. # 37) is **GRANTED**;

(2) Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**; and

(3) **JUDGMENT** in favor of Defendant shall be filed contemporaneously herewith.

This 8th day of September, 2026.

**Signed By:**

***David L. Bunning***

**Chief United States District Judge**

G:\Judge-DLB\DATA\ORDERS\Ashland Civil\2023\23-99 MOO re MSJ.docx